UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

KENNETH KARL WILLIAMS,

          Plaintiff,

v.

RUSSEL RURKA,

          Defendant.

Case No. 2:20-cv-12349

HONORABLE STEPHEN J. MURPHY, III

/

**OPINION AND ORDER**
**GRANTING SUMMARY JUDGMENT MOTION [25]**

Plaintiff Kenneth Karl Williams, a prisoner confined to the G. Robert Cotton Correctional Facility ("JCF"), filed a pro se complaint against several defendants under 42 U.S.C. § 1983. ECF 1, PgID 2–4. After the Court screened Plaintiff's complaint, the Court summarily dismissed the claims against all but one Defendant—Russell Rurka, JCF's Deputy Warden. ECF 3, PgID 74. Plaintiff amended his complaint, ECF 20, and Defendant Rurka answered, ECF 21. Defendant later moved for summary judgment. ECF 25. And Plaintiff timely responded.[1] ECF 29; 30. For the following reasons, the Court will grant summary judgment to Defendant.[2]

---

[1] In Plaintiff's response, he asked the Court "to grant summary judgment in his favor." ECF 30, PgID 460. Because Plaintiff's response argues only that Defendant failed to show that there is no genuine issue of material fact, the Court will liberally construe the response as only an argument to deny Defendant's summary judgment motion. *See Erickson v. Pardus*, 551 U.S. 89, 94 (2007).

[2] The Court need not hold a motion hearing because Plaintiff is an incarcerated pro se litigant. E.D. Mich. L.R. 7.1(f)(1).

1

## BACKGROUND

On March 10, 2020, the Michigan Department of Health and Human Services identified the State's first two cases of COVID-19. ECF 25-4, PgID 217. In response, the Michigan Department of Corrections ("MDOC") immediately implemented measures to ensure the safety of its prison population and minimize the virus's spread. *See generally* ECF 25-5. MDOC, for example, ceased all in-person visiting, limited prisoner transfers, cleaned facilities more often, conducted screening and temperature checks for staff entering facilities, and limited large in-person gatherings. *Id.* at 226, 251–57. MDOC's practices followed the COVID-19 correctional facility guidelines issued by the Center for Disease Control ("CDC"). *See id.* at 226–27. JCF also opened K-unit on March 28—a quarantine housing unit for COVID-positive prisoners. ECF 25-7, PgID 389.

JCF reported its first COVID-positive case from its prison population on April 10. *Id.* Seventeen days later, the National Guard conducted mass testing across Michigan's prisons. *Id.* The next day, due to the increase in positive cases, JCF moved COVID-positive prisoners to D-unit, which was attached to C-unit where Plaintiff was housed. *Id.*; *see* ECF 25-2, PgID 200. By this time, JCF "was on outbreak status." ECF 25-7, PgID 390. JCF staff continued to follow MDOC's protocols and approached COVID-19 "with serious urgency to do everything possible to minimize the spread of the virus." *Id.*

In the verified amended complaint, Plaintiff disputed the relevant dates. *See generally* ECF 20. First, Plaintiff alleged that JCF prisoners began testing positive

2

around March 25. *Id.* at 122. Second, Plaintiff alleged that JCF began moving COVID-positive prisoners to D-unit on April 7. *Id.* at 123. When asked how he knew that the prisoners moved to the D-unit were COVID-positive, Plaintiff responded that "staff informed [him]" and "[i]t wasn't a secret." ECF 25-2, PgID 200–01.[3]

Concerned with D-unit's proximity and the hallway connecting C-unit to D-unit, Plaintiff asked a prison officer to shut the door separating the two units. ECF 1, PgID 27. The officer denied Plaintiff's request. *Id.* Then, on April 15, Plaintiff asked Defendant Rurka to move him to a different housing unit. *Id.* Defendant denied the transfer and responded, "it['s] not really necessary to move you to another housing unit[] because C[OVID]-19 is just another form of the flu and is not really that harmful unless a person already has an underlying illness." *Id.* at 27–28.

Defendant did not deny the statement. *See* ECF 25-7, PgID 389. As Defendant put it, "[l]ittle was known about COVID-19 early on in the pandemic, and while it was being taken seriously, it was logical to explain how [the virus] spread as similar to the flu." *Id.* at 390. Defendant also explained that because JCF "was on outbreak status," a transfer request would be accommodated only "in an emergent situation," or if a medical professional requested that a prisoner be moved. *Id.* Further, "[i]t was a priority of JCF to maintain an environment where tensions did not escalate, and prisoners [remained] calm." *Id.*

---

[3] The record supports Plaintiff's contention that COVID-positive prisoners were moved to D-unit before April 28. According to JCF's "COVID Protocol Update," prison officials moved "close contact" inmates to D-unit as early as April 8. ECF 25-6, PgID 325. If "close contacts" tested positive, they "remain[ed] in [] D-unit for [fourteen] days on medical quarantine." *Id.*

3

Around April 20, Plaintiff began exhibiting COVID-19 symptoms. ECF 20, PgID 124; *see* ECF 25-2, PgID 204. Plaintiff, however, did not notify JCF's medical clinic because he "thought he had regular flu symptoms" and that he would only request healthcare if "something really [was] wrong with [him]." ECF 25-2, PgID 204–05; *see also* ECF 25-8, PgID 393. A week later, the National Guard tested Plaintiff for COVID-19. ECF 25-2, PgID 203–04. The next day, Plaintiff learned that he tested positive, ECF 1, PgID 30, and he was promptly quarantined. ECF 25-2, PgID 203. Plaintiff's infection allegedly caused him many lingering side effects: liver damage, lung damage, reproductive organ damage, vision loss, diminished cognitive skills, migraines, and mental anguish. ECF 20, PgID 126.

Plaintiff claimed that Defendant's refusal to move him out of C-unit constituted deliberate indifference under § 1983. *Id.* at 122. In support, Plaintiff alleged that Defendant Rurka was "fully aware" that D-unit's proximity to C-unit created a substantial risk of harm, and that Defendant's actions caused Plaintiff "wanton and unnecessary" injury in violation of the Eighth Amendment. *Id.* Plaintiff sued Defendant in his official and personal capacity and sought declaratory relief as well as money damages. *Id.* at 126–27.

## LEGAL STANDARD

The Court must grant a summary judgment motion "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A moving party must point to specific portions of the record that "it believes demonstrate the absence of a genuine

4

issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the moving party has met its burden, the non-moving party may not simply rest on the pleadings but must present "specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (emphasis omitted) (quoting Fed. R. Civ. P. 56(e)).

A fact is material if proof of that fact would establish or refute an essential element of the cause of action or defense. *Kendall v. Hoover Co.*, 751 F.2d 171, 174 (6th Cir. 1984). A dispute over material facts is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). When considering a summary judgment motion, the Court must view the facts and draw all reasonable inferences "in the light most favorable to the non-moving party." *60 Ivy St. Corp. v. Alexander*, 822 F.2d 1432, 1435 (6th Cir. 1987) (citations omitted).

In this case, Plaintiff's verified complaint carries "the same force and effect as an affidavit" for summary judgment purposes. *El Bey v. Roop*, 530 F.3d 407, 414 (6th Cir. 2008) (citing *Lavado v. Keohane*, 992 F.2d 601, 605 (6th Cir. 1993)). "[F]or inferences, thoughts, and opinions to be properly included in a Rule 56 affidavit, they must be premised on firsthand observations or personal experience, and established by specific facts." *Giles v. Univ. of Toledo*, 214 F.R.D. 466, 469 (N.D. Ohio 2007) (collecting cases).

## DISCUSSION

The Court will first grant summary judgment to Defendant for Plaintiff's official capacity claims. After, the Court will grant qualified immunity to Defendant.

I. <u>Official Capacity Claims</u>

   A.   *Money Damages*

The Eleventh Amendment bars Plaintiff's claims for money damages against Defendant in his official capacity. Without a State's consent or congressional abrogation, the Eleventh Amendment prohibits money damage actions against States in federal court. *Kentucky v. Graham*, 473 U.S. 159, 169 (1985). "This bar remains in effect when [S]tate officials are sued for damages in their official capacity." *Id.*

As a Deputy Warden in an MDOC facility, Defendant Rurka is a State official. And the State has neither consented to Plaintiff's suit nor has Congress abrogated the State's immunity. *See Will v. Mich. Dep't of State Police*, 491 U.S. 58, 65 (1989) (holding that the language of § 1983 "falls far short" of congressional abrogation). The Court will therefore grant summary judgment to Defendant for Plaintiff's money damage claims.

   B.   *Declaratory Relief*

"Whether a suit against State officials in their official capacity is deemed to be against the State depends on whether the plaintiff seeks 'retroactive' or 'prospective' relief." *Doe v. Wigginton*, 21 F.3d 733, 736 (6th Cir. 1994) (quotation omitted). Where retroactive relief compensates a plaintiff for past constitutional rights violations, prospective relief compels a State officer's future compliance with federal law. *Id.* at

737 (citation omitted).[4] Unlike retroactive relief, official-capacity claims for prospective relief are not barred by the Eleventh Amendment. *Id.* at 737 (citation omitted).

But the declaratory relief that Plaintiff requested is retroactive. ECF 20, PgID 126. And it simply has no link to Defendant Rurka's future compliance with federal law. *Id.*

To compare, in *Doe*, an inmate sued prison officers in their official capacities for declaratory relief. 21 F.3d at 736. The inmate claimed that the officers' enforcement of a prison medical policy violated his constitutional rights. *Id.* The court held that the inmate's claim was not barred by the Eleventh Amendment because he sought to prevent future constitutional violations. *Id.* at 737. But here, the declaratory relief Plaintiff requested pertains only to Defendant Rurka's actions in April 2020 and does not concern JCF's COVID policies or procedures going forward. *See* ECF 20, PgID 126 (Plaintiff sought three declaratory judgments: (1) Defendant is not entitled to qualified immunity, (2) Defendant acted with deliberate indifference, and (3) Defendant's actions caused Plaintiff's COVID-19 diagnosis). Even if the Court issued the declaratory judgments, the remedy would not constrain Defendant or other prison officials from causing future grievances against JCF prisoners. In the end, the Eleventh Amendment bars Plaintiff's official-capacity claim

---

[4] Although retroactive compensation usually takes the form of money damages, it may also take the form of declaratory relief. *See Wigginton*, 21 F.3d at 737; *Cory v. White*, 457 U.S. 85, 90 n.2 (1982) (noting that the Eleventh Amendment does not, necessarily, only bar suits that seek money damages).

7

for declaratory relief and thus the Court will grant summary judgment to Defendant on that claim.

II. <u>Deliberate Indifference</u>

To establish a § 1983 claim, Plaintiff must prove "that (1) a person, (2) acting under color of [S]tate law, (3) deprived [him] of a federal right." *Berger v. City of Mayfield Heights*, 265 F.3d 399, 405 (6th Cir. 2001) (citation omitted). "Qualified immunity is an affirmative defense" to a § 1983 claim. *English v. Dyke*, 23 F.3d 1086, 1089 (6th Cir. 1994) (citation omitted). It "'shield[s]' public officials from money-damages liability if 'their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Citizens in Charge, Inc. v. Husted*, 810 F.3d 437, 440 (6th Cir. 2016) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).

Once a defendant asserts a qualified immunity defense, "Plaintiff bears the burden of showing that [the] defendant[] [is] not entitled to qualified immunity." *Maben v. Thelen*, 887 F.3d 252, 269 (6th Cir. 2018) (citing *Chappell v. City of Cleveland*, 585 F.3d 901, 907 (6th Cir. 2009)). Under qualified immunity, the Court must engage in a two-prong analysis and may ultimately decide which prong to analyze first. *Id.* (citing *Pearson v. Callahan*, 555 U.S. 223, 236 (2009)).

First, the Court must "view[] the facts in the light most favorable to [] [Plaintiff]" and "determine whether the officer committed a constitutional violation." *Barton v. Martin*, 949 F.3d 938, 947 (6th Cir. 2020) (citing *Burchett v. Kiefer*, 310 F.3d 937, 942 (6th Cir. 2002)). Second, "if there is a constitutional violation, the [C]ourt

must determine whether that constitutional right was clearly established at the time of the incident." *Id.* (citation omitted). The Court will grant qualified immunity to Defendant on the first prong.

"The Eighth Amendment's deliberate indifference framework includes both an objective and subjective prong." *Wilson v. Williams*, 961 F.3d 829, 839 (6th Cir. 2020) (citing *Farmer v. Brennan*, 511 U.S. 825, 834 (1970)). To establish the objective prong, Plaintiff must show "that he [was] incarcerated under conditions posing a substantial risk" to his health and safety. *Farmer*, 511 U.S. at 834 (citation omitted). Under the subjective prong, Plaintiff must show that a prison official knew of such risk yet recklessly disregarded it. *Id.* at 836–37. Plaintiff's claim fails under the subjective prong.

There is no question that Defendant knew of the risks related to COVID-19. By the time Plaintiff asked Defendant to be transferred, Michigan's Governor had declared a state of emergency, ECF 25-4, JCF had implemented many new procedures to minimize the virus's spread, ECF 25-5, PgID 224–28, and JCF had reported its first COVID-positive prisoner, ECF 25-7, PgID 389. When a risk of harm is obvious, the Court "may infer the existence of [a] subjective state of mind." *Hope v. Pelzer*, 536 U.S. 730, 738 (2002).

Still, Plaintiff failed to show how Defendant recklessly disregarded COVID-19's risks. Prison officials are not required to "take every possible step to address a serious risk of harm." *Williams*, 961 F.3d at 844 (collecting cases). Instead, the Court must examine the "constraints facing the official," and decide whether the prison

9

official's response was reasonable under the circumstances. *Id.* (quoting *Wilson v. Seiter*, 501 U.S. 294, 303 (1991)). A reasonable response relieves a prison official of liability "even if the harm ultimately was not averted." *Farmer*, 511 U.S. at 844.

And Defendant's response *was* reasonable. Although Defendant was aware of COVID-19's risks, the early stages of the pandemic were uncertain. ECF 25-5, PgID 234 (affidavit from MDOC Director stating that as of April 20 "COVID-19 information, including protocols and procedures, was changing rapidly as the MDOC received updated information from the CDC."). Despite the uncertainty, JCF took swift action to ensure compliance with all CDC guidelines and to protect its prisoners and staff. *Id.* at 224–41; ECF 25-6, PgID 261. JCF cleaned facilities more often, quarantined infected inmates, provided masks for prisoners and staff, limited large gathering and prisoner transfers, and implemented testing requirements. ECF 25-6, PgID 261–62. From March 2020 to the present, JCF consistently enforced preventive measures to minimize COVID-19's transmission. *See id.* at 261. As Deputy Warden, Defendant complied with JCF's procedures and attempted to maintain a "safe and secure environment for all staff and prisoners." ECF 25-7, PgID 387; *see Williams*, 961 F.3d at 841, 843 (holding that a prison's implementation of "ongoing and dynamic" preventive measures—including prisoner masking, regular cleaning of facilities, quarantining infected inmates, and screening for symptoms—shows a reasonable response to COVID-19); *see also Wooler v. Hickman*, 377 F. App'x 502, 506 (6th Cir. 2012) ("[C]onsistent efforts to reduce [a virus's] risk [] preclude a finding of deliberate indifference.").

10

Besides, Defendant reasonably denied Plaintiff's transfer request. By April 15, due to COVID-19's high rate of transmission, JCF had limited its prisoners' cell-to-cell movements. *See* ECF 25-6, PgID 262. Unless a prisoner demonstrated "an emergent situation such as medical necessity," JCF would not accommodate a request for a cell move. ECF 25-7, PgID 390; *see also* ECF 25-5, PgID 233 ("Cell moves shall only be made if absolutely necessary (e.g., medical)"). And Plaintiff provided no evidence that confirmed his situation was "emergent" or "medically necessary." *See generally* ECF 1; ECF 20; ECF 30, PgID 469–89. Thus, constrained by JCF's preventive measures, Defendant could not simply move Plaintiff to another cell unit. *Williams*, 961 F.3d at 844 (concluding that a "failure to make robust use of transfer" does not constitute deliberate indifference when a prison implements other measures to prevent COVID-19 infections).

Finally, Defendant's comments to Plaintiff—equating COVID-19 to the flu—do not establish a deliberate indifference claim. As discussed, neither Defendant nor JCF ignored COVID-19's risks. ECF 25-2, PgID 188–93 (Plaintiff acknowledging the steps JCF took to minimize COVID-19 transmission). What is more, Defendant explained that it was a priority "to maintain an environment where tensions did not escalate, and prisoners [remained] calm." ECF 25-7, PgID 390. Even if Defendant's comments inadequately addressed Plaintiff's concerns, the statement alone would not mean that Defendant turned a blind eye to Plaintiff's safety. *See Cameron v. Bouchard*, 815 F. App'x 978, 986 (6th Cir. 2020) (noting that an "imperfect" response to COVID-19 cannot establish deliberate indifference claim) (citation omitted).

Because Defendant acted reasonably, Defendant did not commit a constitutional violation. The Court will therefore grant qualified immunity to Defendant.[5] Last, the Court will deny Plaintiff leave to appeal in forma pauperis because he cannot take an appeal in good faith. *See* § 1915(a)(3).

### ORDER

**WHEREFORE**, it is hereby **ORDERED** that the summary judgment motion [25] is **GRANTED**.

**IT IS FURTHER ORDERED** that leave to appeal in forma pauperis is **DENIED**.

This is a final order that closes the case.

**SO ORDERED.**

s/ Stephen J. Murphy, III  
STEPHEN J. MURPHY, III  
United States District Judge

Dated: September 8, 2022

---

[5] In all, the only fact in dispute is the date on which JCF moved COVID-positive prisoners to D-unit. *See supra* note 2. Even if Plaintiff established that COVID-positive prisoners were first transferred to D-unit on April 7, Plaintiff's claim would still fail. For one, such evidence would not refute an essential element of Defendant's qualified immunity defense. *See Kendall v. Hoover Co.*, 751 F.2d 171, 174 (6th Cir. 1984). In either situation, Defendant's denial of Plaintiff's transfer request was reasonable under the circumstances. The disputed date is therefore immaterial. For another, Plaintiff did not allege that Defendant was personally involved with the placement of COVID-positive prisoners. *See generally* ECF 20; 30. Even if Plaintiff had relied on the theory of supervisory liability, Plaintiff must still show that Defendant personally encouraged or condoned the unconstitutional actions of other prison officials. *Peatross v. City of Memphis*, 818 F.3d 233, 241–42 (6th Cir. 2016). Plaintiff did not do so. *See generally* ECF 20; 30.

## **CERTIFICATE OF SERVICE**

I hereby certify that a copy of the foregoing document was served upon the parties and/or counsel of record on September 8, 2022, by electronic and/or ordinary mail.

s/ David P. Parker  
Case Manager
